**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NICOLE TRUELOVE,**<br>    *Plaintiff,* | §<br>§<br>§ | |
| **v.** | §<br>§ | **CIVIL ACTION NO. 4:19-CV-00763** |
| **TEXAS DEPARTMENT OF**<br>**CRIMINAL JUSTICE,** *et al.,*<br>    *Defendants.* | §<br>§<br>§<br>§ | |

**DEFENDANT WINDHAM SCHOOL DISTRICT, CLINT CARPENTER AND**
**LUANN PICKETT'S MOTION FOR SUMMARY JUDGMENT**



# Exhibit C

Deposition of Charles Bell
Bates Nos. C1-44

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICOLE TRUELOVE, | } | Civil Action |
| | } | No.:4:16-cv-893 |
| Plaintiff, | } | (Jury Trial) |
| | } | |
| v. | } | |
| | } | |
| TEXAS DEPARTMENT OF | } | |
| CRIMINAL JUSTICE, et | } | |
| al., | } | |
| | } | |
| Defendants. | } | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

CHARLES BELL

November 6, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF CHARLES BELL, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 6, 2019, from 12:22 p.m. to 1:27 p.m., before Janet G. Hoffman, CSR in and for the State of Texas, reported by machine shorthand, at the TDCJ Conference Center, 1206 Avenue I, Huntsville, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto. Rule 30(b)(5) was waived, by agreement of counsel.

Ex. C 1

2

APPEARANCES


FOR THE PLAINTIFF:

MR. DICKY GRIGG
LAW OFFICES OF DICKY GRIGG
The Park at Eanes Creek
4407 Bee Caves Road, Bldg. 1, Suite 111
Austin, Texas   78746
512.474.6061
dicky@grigg-law.com


FOR DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:

MR. CHRISTOPHER L. LINDSEY
MS. SHEAFFER K. FENNESSEY
ASSISTANT ATTORNEY GENERAL
P. O. Box 12548
Austin, Texas   78711-2548
512.463.2080
christopher.lindsey@oag.state.tx.us
sheaffer.fennessey@oag.texas.gov


FOR DEFENDANT WINDHAM SCHOOL DISTRICT:

MR. BRUCE GARCIA
ASSISTANT ATTORNEY GENERAL
P. O. Box 12548
Austin, Texas   78711-2548
512.463.2130
bruce.garcia@oag.texas.gov


ALSO PRESENT:

CALYSTA LANTIEGNE
MICHAEL P. MONDVILLE

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. C 2

3

INDEX

                                                PAGE

Appearances................................    2

      CHARLES BELL

EXAMINATION
      By Mr. Grigg...........................    4


ERRATA PAGE................................    41
ACKNOWLEDGMENT OF DEPONENT.................    42
REPORTER'S CERTIFICATION..................    43


E X H I B I T S

NO.              DESCRIPTION                PAGE
Exhibit 1        Deposition notice            5
Exhibit 2        Letter to witness dated
                 11-4-19 re topics of
                 testimony                     5
Exhibit 3        Windham School District
                 policies, procedures,
                 directives                   12
Exhibit 5        Witness's curriculum vitae   11

Charles Bell 11/6/2019

4

CHARLES BELL, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. GRIGG:

Q.   Tell us your name, please, sir.

A.   Charles Bell.

Q.   And Mr. Bell, how are you employed?

A.   I'm employed with the Windham School District.

Q.   And do you work here in Huntsville or in Austin or where?

A.   Here in Huntsville.

Q.   Okay.  What is your title with the Windham School District?

A.   I'm the department director for operational support and information technology.

Q.   Have you given your deposition before?

A.   I have.

Q.   And can you tell me roughly how many times?

A.   One time.

Q.   And do you know that you're here in the capacity to represent the school district on certain areas?

A.   Yes, sir.

Q.   Is that what your role was in the last deposition?

Ex. C 4

Charles Bell 11/6/2019

5

A.   It was not -- it was not a Windham School District case.

Q.   Was it -- tell me what kind of case it was, if you can.

A.   It was a Texas Department of Criminal Justice case on a wrongful termination -- employee termination.

Q.   All right.  Okay.  Now, I'm going to hand you what has been marked as Exhibit 1.

(Exhibit 1 marked.)

Q.   (By Mr. Grigg)  And that is the subpoena that we sent to your lawyers.  Have you had a chance to review that?

A.   I have.

Q.   And we've asked for the school district to furnish someone to testify about those various topics, and they've selected you.  And you understand that you're here testifying on behalf of the district?

A.   Yes, sir.

Q.   All right.  Now, I want to ask you -- and I'll give you a copy of this letter that is Exhibit 2.

(Exhibit 2 marked.)

Q.   (By Mr. Grigg)  And this was a letter sent to me by Mr. Garcia concerning some of these topics on which ones you are familiar with and which ones you may not.  So we'll be discussing those and the letter as we

6

go through this.  Okay?

A.   Yes, sir.

Q.   All right.  And you understand, basically, the rules of a deposition, that you're under oath, same oath as if you were there in front of the federal judge.  You understand that, do you not?

A.   Yes, sir.

Q.   That you've sworn to tell the truth?

A.   Yes, sir.

Q.   And you understand that the court reporter feverishly pecking away at that machine is taking down everything you say and I say?

A.   Yes, sir.

Q.   And that if you testify in the trial of this case and say something different than you say today, I can confront you with what you say?

A.   I understand.

Q.   And you understand also that what you say will be typed up and we can read that to a jury, if necessary.  Do you understand that?

A.   Yes, sir.

Q.   Okay.  Now, I don't have a resume or a CV. Can you tell me a little bit about -- did you bring one, or do you have one?

A.   I turned one in.

7

Q.    Do you have any explanation why your lawyers are hiding your...  All right.  Let's just go through your background quickly.  First, your education.

A.    Bachelor of science degree in criminology and corrections from Sam Houston State University.  Graduated in 1987.

Q.    All right.  And then briefly trace your career for me since 1987.

A.    Okay.  I was working for the Texas Department of Criminal Justice.  I began in 1984.  So I was working for the Department of Corrections as I was going to school.  I was a correctional officer, sergeant, lieutenant, captain, major, assistant regional director, and Warden I and Warden II.  I retired September of -- July 31st of 2015.

Q.    From the?

A.    Texas Department of Criminal Justice.

Q.    All right.  And what was your highest ranking, if you will, with the department?

A.    I was a Warden II assigned to the Eastham Unit when I retired.

Q.    And help me make sure.  Is Warden I above Warden II?

A.    The other way.

Q.    Okay.  Warden II -- is Warden II then the --

8

would be the highest-ranking employee of the department in a certain unit?

A.   Yes, given -- depending on the size of the facility determines whether there's a Warden I assigned or a Warden II.  The larger size facilities are Warden II.

Q.   What facility were you at when you retired?

A.   Eastham.

Q.   Were you ever assigned to work at Ferguson?

A.   No, sir.

Q.   All right.  Now, in 2015 you left the department, and where did you go?

A.   September of 2015 I went to work for the Windham School District.

Q.   Okay.  In what capacity?

A.   My title at that time was department administrator for operational support.

Q.   And what was your -- what is your title now?

A.   Department director.  Still includes the department of operational support and includes the department of information technology.

Q.   What was your position in November of 2017 when this rape occurred?

A.   That would have been the department administrator title.

Charles Bell 11/6/2019

9

Q. All right. Help me understand what your department -- what's the official name of it? Operational support --

A. Yes, sir, operational support.

Q. And you are department administrator?

A. That's correct.

Q. And that's what you were in November of 2017?

A. Yes, sir.

Q. Okay. Help me understand what your department does, and then I'm going to ask you specifically what your duties are.

A. Okay. The department of operational support within the Windham School District is responsible for data collection in terms of Windham educational data that we report to TEA, Texas Education Agency. We manage the auditing and compliance section for the schools that we operate within the Texas Department of Criminal Justice. We are the research component for the district in terms of evaluating the effectiveness of Windham programs.

Q. All right. You mentioned earlier about, you know, compliance and auditing. On compliance, does that include compliance with Texas Department of Criminal Justice policies?

A. It includes policies that are relevant to

Ex. C 9

Charles Bell 11/6/2019

10

Windham in terms of tool control policy, chemical control policies.

Q.   Go ahead.

A.   Those are -- those are things that our teachers are directly involved with.

Q.   All right.  What about safety policies for the safety of teachers?

A.   Windham doesn't have any policy authority over that.  The Texas Department of Criminal Justice has authority over those policies.  And Windham employees, like all other individuals that work in or on a facility, are subject to TDCJ's security regulations and safety policies.

Q.   All right.  In the compliance phase of your department, do you oversee compliance of your employees with Texas Department of Criminal Justice policies?  I sort of got sidetracked.  Does that question make sense?

A.   I'm sorry.  Could you repeat that, please?

Q.   Before I do that, while I'm thinking -- would you hand your CV to the court reporter?  Let's mark as No. 4.

THE REPORTER:  We've already marked something else as No, 4, so this would be No. 5.

MR. GRIGG:  Oh, yeah.  We've marked his book over there.

11

(Exhibit 5 marked.)

Q.   (By Mr. Grigg)  Okay.  You read it?

A.   Yes, sir.

Q.   And No. 5, is that an up-to-date, accurate copy of your CV?

A.   Yes, sir.

Q.   Okay.  Now, let me ask you:  Back to what we were talking about, I know you said your department is responsible for compliance, auditing.  Are the compliance and auditing you're talking about to make sure you comply with Texas Department Education policies, and that kind of thing, or what?  I'm a little lost.

A.   The compliance auditing that I'm referencing is our education staff's compliance with our educational policies.

Q.   Windham's policies?

A.   Correct.

Q.   All right.  Is there anything that your department does to make sure your employees are complying with Texas Department of Criminal Justice policies?

A.   All newly hired Windham employees, as part of their new-hire orientation, receive 12 hours of security training, security awareness, correctional awareness

12

training before they begin their work on their unit of assignment.  And then each employee that works on a unit is required to have 12 hours of security training annually.

Q.   And is there anything in Exhibit No. 4, this book that you prepared, that would show what's covered in that training?

A.   The actual training is developed by the Texas Department of Criminal Justice correctional training department, and the training is conducted by the Texas Department of Criminal Justice correctional training staff.  To your question, there is a staff development -- a Windham staff development policy in there that says Windham employees are required to get that training.  So it stipulates that Windham employees will receive the training that's been developed by and conducted by Texas Department of Criminal Justice.  It's their policies.

Q.   All right.  So Windham doesn't come up with the training; the department does?

A.   That is correct.

(Exhibit 3 marked.)

Q.   (By Mr. Grigg)  Okay.  All right.  And I think I'm sure on this because I'm looking at your letter on Exhibit 3.  And when asked about safety of Windham

13

employees, it states, quote, Windham has, quote, no policy-making authority regarding the safety of Windham employees. Is that true?

A. Windham has no policy-making authority over the governance, the oversight, of the facility. Windham -- so no, we have no policy-making authority.

Q. Does Windham have any policies that would relate to the safety of your employees when they're working at prisons?

A. Well, I would say that the policy requiring they attend the Texas Department of Criminal Justice training is a safety policy.

Q. Other than that, are there --

A. The other policies that are Windham-specific policies relate specifically to things like accident prevention.

Q. Not security and safety related to offenders?

A. That's correct.

Q. Okay. Obviously, the safety of your teachers is something that's very important to Windham School District, is it not?

A. Yes, sir.

Q. And you're telling me that you basically have to rely, and your teachers have to rely, on safety being provided by the Texas Department of Criminal Justice?

14

A.   All employees that are on facility have a
responsibility for correctional awareness, to be aware
of their surroundings for security awareness and to
report any inappropriate activity.

Q.   Are you saying Ms. Truelove did anything wrong
that caused her being raped?

A.   I'm not saying that.

Q.   Are you aware of anything that she did wrong,
when you're talking about responsibilities, that led to
her being raped?

A.   I am not.

Q.   Now, I need to -- help me understand sort of
what I'm going to call the chain of command at Windham
schools.  All right?  We start out with teachers like
Mrs. Truelove.  Who are their immediate bosses or
superiors?  What job title?

A.   The teacher's supervisor would be the
principal over that facility.

Q.   Is that the principal in residence, I guess
they call it?

A.   No, sir.

Q.   Okay.  That's the campus principal?

A.   Yes, sir.

Q.   All right.  And who would have been the campus
principal of the Ferguson Unit in November 2017 when Ms.

Ex. C 14

15

Truelove was raped?

A.   I believe that was LuAnn Picket.

Q.   Is she still there?

A.   She is not at the Ferguson Unit.  She is still with Windham.

Q.   What is her title now?

A.   She's a principal.

Q.   Still a campus principal?

A.   Yes, sir.

Q.   What unit is she in now, if you know?

A.   I don't know really.  I can't recall right now.

Q.   Do you know if her transfer was in any way related to Ms. Truelove being raped?

A.   I do not.

Q.   All right.  And then above campus principal, you have a principal in residence?

A.   That was the term used at the time.  They're now called regional principals.

Q.   Is the regional principal or principal in residence over several units, I guess?

A.   Yes, sir.

Q.   And who would that have been in -- who would have been in charge of Ferguson back in 2017?

A.   I don't recall who that was.

Ex. C 15

16

Q. And then above that's the area principal in residence, or something?

A. Above the principal in residence or regional principal, you have the division director for instruction.

Q. Do you know who that would have been in 2017?

A. I don't recall. I think the position was actually vacant at the time.

Q. And what's above that?

A. The superintendent.

Q. And who was the superintendent at the time?

A. Dr. Clint Carpenter.

Q. Is he still the superintendent today?

A. No, sir.

Q. Is he still employed by Windham today?

A. No, sir.

Q. What does he do today, if you know?

A. As far as I know, he's retired.

Q. Now -- and above him would be the trustees, which are the same people as the board of the Texas Criminal Justice --

A. Yes, sir.

Q. -- Department?

A. Yes, sir.

Q. Okay. Now, who makes the policies -- and this

17

is very general.  We can get more specific later.  Who is responsible for promulgating and writing policies for the Windham School District?

A.    Those policies would be written within our two divisions, the division of instruction and division of operations.  And those policies would be drafted, revised -- whichever the case may be -- and routed through the various proponents for review and input.  And eventually, the final decision-making authority would be the division director and/or the superintendent.

Q.   And you think the division director back in 2017 was vacant?

A.   I think it was vacant.  I just don't recall right now.

Q.   Let me ask you:  Are you the head of operational support, or do you have a boss?

A.    My supervisor is the division director of operations/CFO.

Q.   And that is who?

A.    Robert O'Banion.

Q.   And what about back in November of 2017?  Was it still Mr. O'Banion?

A.    Yes.

Q.    And help me with his title.

Ex. C 17

18

A. He's the division director, chief financial officer/operations.

Q. And generally, what is this department responsible for? Is it what you've already gone over with me? Or --

A. The operations? It is what I've already related to you, but it also includes all of the budget and finance section within Windham.

Q. Now, Windham does have sexual harassment policies, do they not?

A. Yes, sir.

Q. Because they certainly don't want sexual harassment of any kind to cause a hostile work environment for your teachers, your employees. Correct?

A. That's correct.

Q. And anything in these policies, is there anything related to sexual harassment by an offender?

A. Sexual misconduct by an offender is covered and governed by TDCJ's policies on the disciplinary rules and procedures for offenders. Windham employees are trained, in the training that we discussed earlier, on how to write disciplinary cases in the event of disciplinary infractions.

Q. And where would I find these policies that these teachers -- your teachers are trained on? Is

Ex. C 18

19

there a handbook?  Is there -- what?

A.   The -- you can -- those policies, curriculum for those training would be with the Texas Department of Criminal Justice in their correctional training department, I suppose.

Q.   All right.  Does Windham have any training you give teachers on what to do with problems in their classes?

A.   Those issues are all covered with TDCJ's security training at new-hire and annually.

Q.   All right.  So -- and if I've asked you this, I've forgotten -- where do I find copies of this training that your teachers get?

A.   Texas Department of Criminal Justice.

Q.   All right.  And Windham doesn't have any additional training you do for your teachers in this training you described for me as far as safety or security?

A.   No, sir.  It's all covered in that Texas Department of Criminal Justice training.

Q.   Now, you have policies we talked about on sexual harassment.  But if I'm understanding you, nothing in these policies addresses sexual harassment by an offender?

A.   That's correct.

Charles Bell 11/6/2019

20

Q.   All right.  Now, what training or what policies do teachers follow as far as disciplining offenders that cause problems in their classroom?

A.   Well, again, the training they receive from the Texas Department of Criminal Justice correctional training staff on how to manage behavioral problems within a classroom, which could include addressing behavior verbally, informally resolving, to formal disciplinary cases, to having students removed from class.

Q.   Are you familiar with the term "write up a case" or "write a case"?

A.   Yes, sir.

Q.   Tell me what that means.

A.   Any employee who witnesses a disciplinary rule infraction, misconduct, will report that incident on a TDCJ form that documents the time, date, and facts surrounding that infraction.  That's what it means to write a case.

Q.   All right.  And help me understand.  A teacher can write a case and not necessarily send the student out of class?

A.   That could happen.

Q.   And what happens to this form after the teacher fills it out?

21

A.   The teacher turns it in.  It may vary from unit to unit, but typically, they're going to turn it in to the principal or the shift supervisor.  Either way, it gets turned over to the shift supervisor to be processed through the Texas Department of Criminal Justice disciplinary process.

Q.   So the only person that is in the chain, so to speak, for Windham would be the campus principal?

A.   The teacher and --

Q.   Teacher, then the campus principal?

A.   Yes, sir.

Q.   Okay.  Now, in Ms. Truelove's case, are you familiar with the problem starting with the inmate masturbating?

A.   I'm not familiar with that.

Q.   All right.  And I think I know the answer, but does Windham have any kind of policies for how a teacher deals with an offender in class masturbating?

A.   That is behavior that would be immediately reported to the TDCJ correctional staff to have the student removed.

Q.   Would that then -- at least immediately that would skip the policy of writing the case up?  That would be done later, and they would just have the student removed?

Charles Bell 11/6/2019

22

A.   They would have the student removed and then write the case at a later time.

Q.   Are you aware of instances where a student masturbating in front of your teachers has been a problem?

A.   I'm not.

Q.   In addition to Ms. Truelove, have you had other teachers since you've been at Windham that have been assaulted physically by offenders?

A.   To my knowledge, no.

Q.   This is the only one you know of?

A.   Yes, sir.

Q.   Okay.  Does Windham keep any kind of records that would show offenders physically attacking or assaulting teachers?

A.   No, sir.  All of those are TDCJ records.

Q.   Does Windham have any records on writing up cases or how many cases a teacher writes up, anything like that kind of data?

A.   No, sir, not to my knowledge.

Q.   Does Windham keep any kind of data related to teachers having problems in their classrooms?

A.   There's not any of that type of data maintained that I'm aware of.

Q.   By Windham?

23

A.   By Windham.

Q.   And once a teacher writes up a case, then it's up to the Texas Department of Criminal Justice to decide what punishment, if any, is given to an offender?

A.   That's correct.

Q.   Because Windham teachers have no authority to discipline an offender.  Correct?

A.   That's correct.

Q.   Now, who decides which offenders, which inmates will attend Windham classes?

A.   It begins with the offenders have to meet minimum eligibility requirements that are set forth in TDCJ's policies -- policy on eligibility to attend school and TDCJ's classification plan.  Once -- once a offender meets TDCJ's eligibility requirements, the next step of that is a review of each individual offender's ITP.  ITP stands for individualized treatment plan.  All offenders are given -- are assessed at intake and determined what their programmatic needs are, and their need for programs are determined.  And so that would be the next step to determine who gets enrolled in school.

Q.   All right.  Does Windham have any say in what students attend their programs?

A.   It's based on a priority that is set forth in TDCJ's policy.  Windham identifies in the assessment

24

phase an individual's need.  For example, they are given a Texas adult basic education test to determine their functioning level.  That will identify their educational need.  Do they need adult basic education, remedial reading, or are they more advanced?  So Windham identifies that need.  The priority of enrollment is set by TDCJ's policy.

Q.  Can Windham refuse to teach a student -- an inmate?

A.  If they meet the eligibility requirements and they -- their assessment indicates a need and they are a priority for programming and they are not a behavioral problem, Windham will enroll them.

Q.  Who determines if they're a behavioral problem?

A.  TDCJ's disciplinary process and procedures will indicate a record.  The Texas Department of Criminal Justice classification plan, which outlines, specifies, and determines an individual's custody level, documents their pattern of behavior, their institutional behavior.

Q.  All right.  And I want to make sure I'm following you.  TDCJ determines, okay, this student is eligible for Windham programs.  Correct?

A.  TDCJ says you have to meet a minimum custody

25

level to be eligible to attend Windham programs.

Q.   I'm with you.   They add in other criteria.
But once TDCJ says okay, this student is eligible, then
Windham has to take him?

A.   Windham will enroll him if that individual
meets the criteria that I just explained.

Q.   Here's what I'm trying to determine, I guess:
That criteria is determined by Texas Department of
Criminal Justice.   And if they meet that criteria, they
send them to you?

A.   Right.   Windham provides an educational
service.   And if they meet that criteria, they will
enroll them in class.

Q.   All right.   Now, in reviewing some of your
material, it talks about -- and I may have this -- I
think I have this right -- that if certain offenders --
if they don't have a GED, they're required to take
classes.   Is that your understanding?

A.   That's correct.

Q.   Whether they want to or not?

A.   That is correct.

Q.   And so that, I guess, is TDCJ's policy, not
Windham's, that a student has to go whether they want to
or not?

A.   I believe that's actually statute, in who

Ex. C 25

26

Windham serves.

Q.   And so even if an inmate doesn't want to be there, he's required to attend?

A.   The individual is required to attend; he can refuse.

Q.   But TDCJ can take and make him regret it?

THE REPORTER:   Say that again.   TDCJ can what?

MR. GRIGG:   Can make him regret if he refuses to attend.

A.   No.   He would get a disciplinary case for refusing to attend school.

Q.   (By Mr. Grigg)   Does having to allow students that don't want to be there -- I don't guess students is the right word -- that -- offenders that don't want to be in class, does that increase disciplinary problems?

A.   I've not seen that to be the case.

Q.   Now, let me ask you about funding.   All right?

A.   Yes, sir.

Q.   Does Windham receive any federal funds?

A.   Windham's funding is -- funding information is found in Article 3, Section 7 of the General Appropriations Act.   Our funds flow through the Texas Education Agency.

Q.   Do you receive any federal funds?

Ex. C 26

A.   There is some federal funding, I believe, for our Title 1 programs.  That's not my area, so...

Q.   On your website, Windham claims that you receive funds from elementary -- federal funds from The Elementary and Secondary Education Act.  Is that true?

A.   I'm not familiar specifically with that, so I can't say for certain.

Q.   All right.  Because why I'm asking you is they do say one of the areas that you are prepared to testify to is funding.  Is that correct?  You're prepared to testify about funding?

A.   I am.

Q.   All right.  And Windham receives, if I understand your testimony, federal funds?

A.   Yes, sir.

Q.   All right.  And let me ask you:  Do you know if you receive federal funds from the Carl Perkins Disability Education Act?  And I'm getting this from your website.

A.   Yeah, there are some Perkins funds that the district receives.

Q.   Got that.  And then I've noticed in reviewing some -- you know what sunset is?

A.   Yes, sir.

Q.   In reviewing some of your sunset filings with

28

the legislature, and of course, when you file with the legislature on sunset, you've certainly got to be honest with them, don't you?

A.   Yes, sir.

Q.   And what you've got to say when you're applying with your sunset, Windham talks about that they do receive federal funds.  Is that correct?

A.   Yes, sir.

Q.   All right.  Now, help me understand what your funding is based on.  Because I've seen, like, House Bill 1, which is the sort of state budget bill and all, talk about it's based on counted hours, and that kind of thing.  Help me understand what your funding is based on.

A.   Okay.  Funding is based on contact hours, is outlined in the statute that I referenced a while ago -- a minute ago on so many dollars per student contact hour.  The performance measure targets are set -- those are all defined for Windham through the legislature.

Q.   All right.  And what is a contact hour?

A.   That is a student in the classroom receiving instruction from a teacher, whether that's academic or vocational.

Q.   And if a student is not in a classroom, for whatever reason, then that isn't counted as a contact

Ex. C 28

Charles Bell 11/6/2019

29

hour?

A.   That is correct.

Q.   And that reduces the amount of money that Windham receives?

A.   That is not correct.

Q.   All right.  I thought you said their funding was based on contact hours.

A.   I did say that.

Q.   All right.  Explain to me, then, if contact hours are reduced why that doesn't affect Windham's funding.

A.   There is a plus or minus 5 percent variance on our reporting of our contact hours.  If you fall within that range, then it won't necessarily affect your funding levels.

Q.   Okay.

A.   If Windham is outside of those ranges, then there is a rationale or justification provided for why that may be.  What I'm saying is, is a student not being in class a day wouldn't necessarily relate directly to a reduction in funding because of that day.

Q.   All right.  So they figure out some kind of an overall ratio or -- in other words -- and I'm putting this poorly.  In other words, they don't look and say, okay, you had 2,764 student hours, so you get that much

30

money?  You don't keep a daily record of student hours -- well, go on and explain --

A.   We do.  We keep daily attendance, and those attendance hours are reported to TEA.

Q.   Okay.  And I noticed in some of your literature you talk about that's one of the most important records you keep?

A.   Yes, sir.

Q.   You know, because that's what your funding is going to be based on?

A.   Yes, sir.

Q.   Now, you would agree with me that it shouldn't be a procedure where a teacher has to keep a student in class for funding purposes?

A.   I would say to you that a teacher has the latitude and discretion to remove a student at any time, in their judgment, if it was inappropriate to keep that student in class, for whatever reason that may be.

Q.   And you would agree with me that that should not be affected by having a student in class for funding purposes?

A.   I would say to you that teachers don't make those determinations of whether to keep a student in class or not based on any funding.

Q.   Nor do principals?

Ex. C 30

A.   That is correct.

Q.   And obviously, as we sit here today, they should not use that as a basis for sending students out of class for keeping their classroom safe?

A.   I'm sorry.  Could you repeat that, clarify, rephrase it a little bit?

Q.   Yes.  I'm sorry.  It's a poor question. Principals, teachers, no one in the Windham system should allow funding considerations to affect a teacher's ability to send a student out of their class?

A.   That teacher has that authority to do that, to remove that student from class.

Q.   And you agree with me it should not be affected, that ability, by funding considerations?

A.   Yes, sir.  I believe I just said that.  Yes, sir.

Q.   I just wanted to be sure.

A.   Yes, sir.

Q.   Let me ask you a few questions about this booklet.  I think we marked it as what?  3 or 4?  4?

A.   Let's see.  Mine has a 3 on it.

Q.   All right.  Tell me briefly, then, what Exhibit No. 3 is.

A.   This is a collection of Windham policies that I used in review of the notice that I received.  It also

32

includes an excerpt from the General Appropriations Act that we referenced a few minutes earlier, and the Texas Government Code, which is the authority for the Texas Department of Criminal Justice individualized treatment plan process.

Q.   Got it.  Tell me:  On these policies that you've provided and reviewed, how are they formed?  How are they written?  Who determines these policies at the Windham school?

A.   As we discussed a few minutes earlier, those policies -- these policies are initiated, revised, drafted, whatever the individual policy case may be, from the appropriate Windham division, instruction or operations, depending on who would be the actual proponent for that policy.  The policies are -- they're drafted.  They're routed through Windham's various departments for review and input.  All that information is collected, considered as part of a review process as to what should be included into the policy.

Once that process is concluded, the final authority for approving the policy would be either the division director or the superintendent.  There are some policies that are Windham board policies that require board approval.

Q.   Help give me a feel for what policies require

33

board approval.

A.   Those policies that are generally broad in nature, that give general guidelines and direction to the superintendent and district employees.  So those are generally what the board policies --

Q.   What about these policies you furnished me? Who would be the -- who would have approved and signed off on these policies?

A.   There's four of them listed there, 2 through 5, I believe, that -- yes, that are Windham board policies that -- that would indicate or mean that the board approved that policy.

Q.   All right.

A.   The item No. 6 on the table of contents, 6 and 7, as you see that begin with an SD, are superintendent directives.  And of course, the superintendent would approve those policies.  Item No. 8 on the list is a operational procedure, which would have received the approval of either a division director or the superintendent.

Q.   Did Windham conduct any kind of investigation after Ms. Truelove was raped?

A.   Windham was included with the Texas Department of Criminal Justice review of the incident.

Q.   Was TDCJ in charge of the investigation?

Charles Bell 11/6/2019

34

A.    Yes, sir.

Q.    And Windham participated?

A.    Yes, sir.

Q.    Did Windham change any policies or procedures as a result of Ms. Truelove's rape?

A.    Windham has developed a security awareness procedures manual, which is essentially a compilation of different security regulations within TDCJ policies into a single source document.  And it incorporated some standard practices into the manual.

Q.    Is this furnished -- this manual furnished to Windham employees, teachers?  Who?

A.    They get the -- it's included in their security training.

Q.    Where could I find a copy of this?

A.    We have it within our Windham headquarters.

Q.    Is it something -- because I know a lot of your policies and are online.  Would this be something that's online?

A.    I don't know if it's online or not.  I really -- I don't know.

Q.    What is the official title of this booklet?

A.    Security Awareness Standard Operating Procedures Manual.

Q.    Nothing simple.  Security awareness what?

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. C 34

35

A.   Standard Operating Procedures Manual.

Q.   All right.  And I want to make sure I understand.  This is furnished to your teachers?

A.   They receive the training at their new-hire orientation process, and the teachers that are on the unit get the training as well.  So they have access --

Q.   Do they get a copy --

A.   Yes, sir.  I'm sorry.  We give the new -- all newly hired employees a copy of that.

Q.   And was anything in the manual changed after Ms. Truelove was raped?

A.   It brought together -- or brought into the document existing TDCJ rules and regulations, and we formalized in the document -- in the manual -- standard practices.

Q.   Were changes made in standard practices?

A.   There was not -- there were no changes in standard practices made that I'm aware of.

Q.   And so since the rape -- I want to make sure I'm understanding -- Windham has not changed any of its standard practices for security or safety or anything?

A.   We -- Windham, as part of that review of the incident, pulled those policies together and took what were standard practices that had not previously been in writing and placed them into writing.

36

Q. All right. So you're saying you had these standard procedures but they weren't in writing prior to Ms. Truelove being raped?

A. Yes, sir. There was standard best practices utilized in the daily operation of school activities.

Q. All right. But they weren't in writing?

A. In some cases, that's correct.

Q. And so what you did after the rape was formalized and put these in writing?

A. That is correct.

Q. And who was the person responsible for signing off and saying, okay, these are going to be our written policies? Was that the superintendent or who?

A. The superintendent was the final authority.

Q. Would, like, campus principals have the authority to do that or was that above their pay level or what?

A. I'm sorry. I don't know if I understand what you're asking.

Q. You say the superintendent was the final authority?

A. Right.

Q. Who below the superintendent had authority to standardize these procedures?

A. The unit principal at any time in

coordination, communication, and concurrence of the unit warden could determine that that needed to be done.

Q.   I'm not sure I understand you, because what I'm talking about is you say that these were -- these best practices were formalized and put in writing after Ms. Truelove was raped.  Correct?

A.   We developed that security awareness manual and included that.

Q.   And prior to that, these best practices, or whatever, were not in writing?

A.   There were some that were not.  That is correct.

Q.   Can you tell me which ones, generally -- what practices were not in writing did you put in writing after she was raped?

A.   The one that most readily comes to mind is the requirement that a teacher stand at the door room -- excuse me -- doorway of their classroom during the ingress and egress of students.

Q.   In other words, stand in the hall, sort of? Is that what we're talking about?

A.   Yes, sir.  Standing in the hall but at the doorway of their classroom to allow visibility within the classroom and in the hallway.

Q.   To make sure every offender was out of the

38

room?

A.   That would be one of the reasons.

Q.   What are the others?

A.   Well, as we discussed earlier, it's everyone's responsibility to maintain security awareness and be correctionally aware of what's going on around them. And during those times of student movement, it strengthens that security and correctional awareness when the teachers are standing in the hall by the door so they have a broader area of view, not just their classroom, but movement within the hallway, so if there's any inappropriate behaviors identified, it could be reported.

Q.   And that would be reported to guards?

A.   That's correct.

Q.   And I assume that you have to -- at Windham, teachers and employees have to depend on guards for safety?

A.   It's -- safety is everyone's responsibility.

Q.   But as far as, like, if there's a serious situation, they've got to go to the guards.  Right?

A.   They notify TDCJ's correctional staff to handle the situation.

Q.   And it's important to have guards present and a presence of guards on the educational units, is it

Ex. C 38

39

not?

A.   It is important.

Q.   And do you know how many guards were present on the day -- in the educational unit on the day that Ms. Truelove was raped?

A.   I do not.

Q.   Do you know if there was a shortage of guards?

A.   I do not.

Q.   You don't know what, if anything, the investigation determined as far as the number of guards on that day?

A.   No, sir, I don't.

Q.   Do you know if there's anything in these newly written policies that would have prevented Ms. Truelove from being raped?

A.   Could you rephrase that for me or restate that for me?

Q.   You know, there's some written policies that were not written prior to her being raped.  Were there any of these newly written policies that would have prevented her from being raped?

A.   I can't speak to what may or may not have absolutely prevented an occurrence of an event.  It's a matter of prudence when incidents occur that we review those and determine if there's areas that policy can be

Charles Bell 11/6/2019

40

strengthened.  That was the focus.

Q.   All right.  So let me see if I understand.
All right.  Based on this investigation, some prior best
practices that weren't formalized in written policy were
now formalized?

A.   Yes, sir.

Q.   Were there any policies that were strengthened
or changed or altered based on this investigation?

A.   I don't recall any of those policies being
altered or changed.  I don't recall that being the case.

Q.   Is Windham doing anything today to try to
prevent incidences like this from happening, anything
new or different?

A.   You know, I -- the security awareness manual
and including that in the training is different.  That's
what I'm aware of.

Q.   Let me check.

MR. GARCIA:  Want a couple minutes?

MR. GRIGG:  Oh, yeah.  I've got to read
through this book.

MR. GARCIA:  Well, if you read it as fast
as you did the last one, we'll be all right.

(Proceeding ended.)

Charles Bell 11/6/2019

41

ERRATA PAGE

WITNESS NAME:  CHARLES BELL          DATE:  11/06/2019

PAGE  LINE  CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. C 41

42

_____

ACKNOWLEDGMENT OF DEPONENT


     I, CHARLES BELL, do hereby certify that I have read

the foregoing pages and that the same is a correct

transcription of the answers given by me to the

questions therein propounded, except for the corrections

or changes in form or substance, if any, noted on the

attached errata page.


          _____
          CHARLES BELL                          DATE

43

REPORTER'S CERTIFICATION
DEPOSITION OF CHARLES BELL
TAKEN NOVEMBER 6, 2019

I, JANET G. HOFFMAN, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, CHARLES BELL, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to MR. DICKY GRIGG;

That a copy of this certificate was served on all parties and/or the witness shown herein on

_____.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

___X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for,

Ex. C 43

44

related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 27th day of November, 2019.

_____
JANET G. HOFFMAN, CSR
My notary commission expires 03-14-20

The Legal Connection, Inc.
7103 Oak Meadow, Suite A
Austin, Texas 78736
JBCC Firm No. 656
512.892.5700
512.892.5703 (fax)

Ex. C 44