**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **NICOLE TRUELOVE,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:19-CV-00763** |
| | § | |
| **TEXAS DEPARTMENT OF** | § | |
| **CRIMINAL JUSTICE,** *et al.,* | § | |
| *Defendants.* | § | |

**DEFENDANT WINDHAM SCHOOL DISTRICT, CLINT CARPENTER AND
LUANN PICKETT'S MOTION FOR SUMMARY JUDGMENT**

# Exhibit D



Deposition of Tracy Bailey
Bates Nos. D1-74

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICOLE TRUELOVE, | } | Civil Action |
| | } | No.:4:16-cv-893 |
| Plaintiff, | } | (Jury Trial) |
| | } | |
| v. | } | |
| | } | |
| TEXAS DEPARTMENT OF | } | |
| CRIMINAL JUSTICE, et | } | |
| al., | } | |
| | } | |
| Defendants. | } | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

TRACY BAILEY

November 6, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF TRACY BAILEY, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on November 6, 2019, from 10:06 a.m. to 12:04 p.m., before Janet G. Hoffman, CSR in and for the State of Texas, reported by machine shorthand, at the TDCJ Conference Center, 1206 Avenue I, Huntsville, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto. Rule 30(b)(5) was waived, by agreement of counsel.

Ex. D 1

2

APPEARANCES

FOR THE PLAINTIFF:

      MR. DICKY GRIGG
      LAW OFFICES OF DICKY GRIGG
      The Park at Eanes Creek
      4407 Bee Caves Road, Bldg. 1, Suite 111
      Austin, Texas   78746
      512.474.6061
      dicky@grigg-law.com


FOR DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE:

      MR. CHRISTOPHER L. LINDSEY
      MS. SHEAFFER K. FENNESSEY
      ASSISTANT ATTORNEY GENERAL
      P. O. Box 12548
      Austin, Texas   78711-2548
      512.463.2080
      christopher.lindsey@oag.state.tx.us
      sheaffer.fennessey@oag.texas.gov


FOR DEFENDANT WINDHAM SCHOOL DISTRICT:

      MS. KELSEY L. WARREN
      MR. BRUCE GARCIA
      ASSISTANT ATTORNEY GENERAL
      P. O. Box 12548
      Austin, Texas   78711-2548
      512.463.2130
      kelsey.warren@oag.texas.gov


ALSO PRESENT:

      CALYSTA LANTIEGNE
      ANN HAHN
      CHARLES BELL
      MICHAEL P. MONDVILLE

Tracy Bailey 11/6/2019

3

I N D E X

PAGE

Appearances.................................   2

Stipulations..............................   1

TRACY BAILEY

Examination by Mr. Grigg..............   4

ERRATA PAGE................................   71
ACKNOWLEDGMENT OF DEPONENT.................   72
REPORTER'S CERTIFICATION..................   73

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Deposition notice | 6 |
| Exhibit 2 | Witness's curriculum vitae | 6 |
| Exhibit 3 | TDCJ policies and procedures - Windham | 16 |
| Exhibit 4 | TDCJ disciplinary rules and procedures for offenders, Feb. 2015 | 70 |

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. D 3

Tracy Bailey 11/6/2019

4

TRACY BAILEY,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. GRIGG:

Q.   Tell us your name, please, ma'am.

A.   Tracy Bailey.

Q.   And Ms. Bailey, what is your occupational
title, I guess, so to speak?

A.   I'm the deputy director of management
operations within the correctional institution division
of the Texas Department of Criminal Justice.

Q.   Now, have -- you're aware -- we haven't really
met, but my name is Dicky Grigg.  And I'm representing
Nicole Truelove, a woman who was raped while teaching at
Ferguson Unit.  You understand that, do you not?

A.   Yes, sir.

Q.   And have you ever had your deposition taken
before?

A.   Yes, sir.

Q.   Can you give me a rough idea of how many
times?

A.   Seven or eight.

Q.   And you have been furnished in a capacity to
represent the department in this deposition.  Have you
had your deposition taken in that capacity before?

Ex. D 4

Tracy Bailey 11/6/2019

5

A.   Yes, sir.

Q.   And have all six or seven been in that capacity?

A.   Yes, sir.

Q.   Okay.  So having been deposed before, you basically understand the rules of a deposition, do you not?

A.   Yes, sir.

Q.   And anytime, if you need to take a break -- this is informal -- please do so.  And the basic rules to remember are, one, you understand you're under oath --

A.   Yes, sir.

Q.   -- to tell the truth?  And that anything you say today can be, at the trial of this case, read to the jury.  Do you understand that?

A.   Yes, sir.

Q.   And that also at the trial of this case, if you say anything different than you say today, the law allows me to confront you with what you say today.  You understand that?

A.   Yes, sir.

Q.   All right.  Now, this is basically, I think, what they call a 30(b)(6) deposition, but you understand, do you not, that you're here not necessarily

Tracy Bailey 11/6/2019

6

to testify about your personal knowledge but to testify on behalf of the department. You understand that, do you not?

A. Yes, sir.

Q. All right. And so it's just like what you've done in depositions before, that you are here to represent the department. We understand that. Correct?

A. Yes, sir.

Q. Now I'm going to show you what has been marked Deposition Exhibit No. 1.

(Exhibit 1 marked.)

Q. (By Mr. Grigg) And it's your notes for this deposition. And I'm going to mark it as an exhibit because the court reporter makes a little extra money copying exhibits. And have you had a chance to look at that and review this with your lawyers?

A. Yes, sir.

Q. All right. And those are the topics that I'll be asking you about today. Fair enough?

A. Yes, sir.

Q. Now, I've also -- and I forgot to make copies -- but let me show you Exhibit 2.

(Exhibit 2 marked.)

Q. (By Mr. Grigg) And that is a CV that was furnished to me by your lawyers. Is that an accurate

7

CV?

A.   Yes, sir.

Q.   All right.  Let me have it back so I can ask you some questions about your background.  All right. You graduated from Sam Houston State in '91, and it looks like went to work immediately for the Texas Department of Criminal Justice?

A.   That's correct.

Q.   And since college, have they been your only employer?

A.   Yes, sir.

Q.   All right.  I want to trace a little bit your background, and let me sort of know what your duties were.  And if you need to look at this, let me know. But you started out as a correctional officer and looks like you moved up, sergeant, lieutenant, captain, to a major of correctional officers.  Correct?

A.   That's correct.

Q.   Tell me your duties as a correctional officer and how they changed as you moved up the chain.

A.   I started out as a correctional officer at the Goree Unit.  A correctional officer is tasked with custody and control, basically, of offenders day to day, supervision of the offenders in the areas that the correctional officer is assigned to daily.

Tracy Bailey 11/6/2019

8

Q.   All right.  Did your responsibilities increase as you moved up the chain to major?

A.   Yes, sir.

Q.   All right.  Tell me a little bit about the duties of a sergeant or lieutenant or captain and a major, how your duties and responsibilities changed.

A.   Okay.  Every time I promoted from sergeant to lieutenant to captain to major, your supervision of employees increased.  As a sergeant, you're the first-line supervisor of a correctional officer.  You oversee the daily operations on a facility and the daily supervisions of the correctional officer.

Now, when you promote to a lieutenant, then you're the supervisor of not just the correctional officers but the sergeants, and you're the shift supervisor at that point in time.  That can be from -- anywhere from 20 correctional officers to 60 at a time.

Q.   This is a sergeant?

A.   That's a lieutenant.

Q.   Oh, lieutenant.  Okay.

A.   And then once you promote to a captain, those duties are supervision of the lieutenant as well as the sergeant and the correctional officer.  And you also at that time can take on some administrative duties on a facility.

Ex. D 8

9

Q.   And that's as a major?

A.   That's as a captain.

Q.   All right.  Then you have on here you were promoted to major.

A.   And the major is basically the chief of security on a facility.  You have oversight of the correctional officers all the way up through the captains.  You supervise them, as well as you may have administrative duties.  You can also be the duty warden at specific time periods in the absence of a warden.

Q.   All right.  And these various positions, are they the same that would apply to the Ferguson Unit?

A.   Yes, sir.

Q.   And would they be the same that would apply to the Ferguson Unit back on November 13th of 2017?

A.   Yes, sir.  They had that same supervision there.

Q.   All right.  Now, let me ask you:  The -- when you're a major of correctional officers, are you the head correctional officer at a certain unit?

A.   You can be at a certain unit, or you could have a complex and oversee more than one unit.

Q.   Back in 2017, who was the major correctional officer at the Ferguson Unit?

A.   I can't tell you at this time who the majors

10

were at that point in time.

Q.   How would we find that out?

A.   We could go through the human resource department and they could give us the names of the two majors that were there at that time.

Q.   There would be two majors?

A.   Yes, sir.

Q.   All right.  Now, are the majors that are head of a certain unit, I assume that their responsibility is to make sure that the policies of the department are enforced?

A.   That is one of their responsibilities, yes, sir.

Q.   And to make sure that the correctional officers under them are properly abiding by the guidelines, the rules, the regulations of the department's policies?

A.   They will have oversight of that, yes, sir.

Q.   And what can they do if a correctional officer is not following the policies?

A.   Any supervisor has the responsibility, when there are correctional staff that are not abiding by our policies and procedures, to resolve those issues. Sometimes that can be informally through verbal counseling, or that can be through the disciplinary

Tracy Bailey 11/6/2019

11

process, the employee disciplinary process.

Q.   Got it.  All right.  Now, after that, you moved up to several positions as a warden.  Can you sort of go through with me Warden I, Warden II?

A.   My first senior warden assignment was at the Halbert Unit in Burnet, Texas.  Then from there, I went to still a Warden I but was a promotion to the Byrd Unit here in Huntsville.  And then from there, became the senior warden over security operations here in Huntsville.  And then there, to the warden of the Estelle Unit in Huntsville.

Q.   All right.  Help me understand a little bit at each position what the wardens' duties and responsibilities are, generally.

A.   On any facility, the warden has oversight of that facility.  All security staff and nonsecurity staff that work for the Texas Department of Criminal Justice, they have oversight and supervision of them.  They ensure that custody and control of the offenders are maintained and to make sure that the unit mission is always being enforced.

Q.   What's the difference in a Warden II and a Warden I?

A.   The size of the facility and then the pay of the senior warden that's assigned, due to the size.

Tracy Bailey 11/6/2019

12

Q.   All right.  Will there be just one warden?
Are there assistant wardens, deputy wardens?

A.   You'll have one senior warden on a facility.
And then depending on the size of the facility will
determine if there are one assistant warden or two
assistant wardens, one major, two majors, or there may
not even be an assistant warden, depending on the size
of the facility.

Q.   Back in 2017, what was the setup as far as
wardens are concerned at the Ferguson Unit?

A.   The Ferguson Unit has always had one senior
warden, two assistant wardens, and then two majors.

Q.   Now, two majors, you're talking about major of
correctional officers?

A.   That's correct.

Q.   Now, does the senior warden, I guess, is he
the number one man at a unit?

A.   He is the individual that has oversight of
that facility, yes, sir.

Q.   And he's responsible for making sure the
policies of the department are carried out by those
below him?

A.   Yes, sir.  The ones that work for the Texas
Department of Criminal Justice, yes, sir.

Q.   Correct.  And does he also help make and set

Ex. D 12

Tracy Bailey 11/6/2019

13

the rules and regulations for the unit he's in control of?

A.   All of our agents, all of our departments' units have a set of policies and procedures that are the same for all of our facilities.

Q.   All right.  You say each unit.  Are you talking about, like, Ferguson?  That's a unit?

A.   That's a unit.

Q.   And they have policies that -- general policies that apply to Ferguson just like all other units?

A.   The agency has policies that apply to all facilities.

Q.   You're saying agency.  If I say department, we're talking about the same thing, aren't we?

A.   When I say agency, I'm talking about the Texas Department of Criminal Justice.

Q.   Okay.  And if I use "department," can we agree that I'm talking about the Texas Department of Criminal Justice?

A.   We can agree to that.

Q.   All right.  So the policies, I assume, that come down are -- by their nature, have to be general?

A.   In some times they can be general because the area may be a little bit complex and all facilities are

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. D 13

14

a little bit different, but they can overall be enforced fairly the same way.

Q.   All right.  And if they're complex, does the warden have discretion on how he wants to apply them to the people under him?

A.   The only discretion that a warden would have in that is a warden can make a policy stricter.  A warden cannot make a policy more lenient.

Q.   And he is responsible to make sure that that policy is enforced?

A.   Yes.

Q.   All right.  After your stint at being a warden, you became a Director II and a Director III of the correctional training and staff development.  Could you tell me what your duties were -- well, at Director II and III?  What your duties --

A.   As the Director II, I had correctional training and leadership development.  At that point in time, correctional training and leadership development fell underneath the correctional institution division. And that director had oversight for pre-service academies for all correctional officers that were newly hired in our agency, as well as our annual in-service training for all correctional officers within our agency, and then any leadership development courses that

15

we have for our supervisory staff.

Q.   All right.  And from looking at the website, it says that the correctional institutional division is responsible for security-related policies.  Is that correct?

A.   There are a group of policies that the correctional institution division oversees.  The majority are -- of those are security-related policies.

Q.   And that would be looking out for the safety of the people working at the prison?  Would that come under your bailiwick?

A.   There -- some of those policies pertain to the safety of the employees that work on the facility.  Some of them have to do with different procedures on a facility.

Q.   And it also on your website says that you're responsible for the implementation and the tracking of these policies.  Is that correct?

A.   In my current job, underneath the Director III position, the plans and operations department does work underneath me.  So the policies and procedures that fall underneath the correctional institution division, we do track them and update them and make sure that it gets out to the facilities to implement.

Q.   And what was your position on November 13th,

16

2017?

A.   I would have been the Director III position that I'm currently in right now, the deputy director --

Q.   So your duties back -- I'm sorry.

A.   I would be the deputy director of management operations.

Q.   And you would have the same duties as you have today?

A.   My duties have changed a little bit from that time period to now.

Q.   What about your duties regarding overseeing policies of safety?

A.   My duties pertaining to the plans and operations, the oversight of those policies being updated, those policies being posted, reviewed, and implementation of them.  That area was still underneath me at that time.

Q.   Okay.  Would you hand your notebook to the court reporter, and let's let her mark it as 3.

            (Exhibit 3 marked.)

Q.   (By Mr. Grigg)  Would you identify Exhibit No. 3 for us, please, ma'am?

A.   This is the -- some of the -- this is the documentation that I had available to me to prepare for this deposition.

Ex. D 16

17

Q. And did you select these various policies to review, or did someone else furnish them to you?

A. I selected these based on this attachment, F.

Q. All right. Now, let me ask you a couple of things before we go into this. Do you know who the warden was at the Ferguson Unit in November of 2017?

A. Yes, sir, I do.

Q. Who was that?

A. Rocky Moore.

Q. And do you know who the assistant warden was?

A. I know who the two assistant wardens were.

Q. Okay.

A. Bobby Jenkins. He may really be Robert Jenkins by human resource. And then James McKee.

Q. And James who?

A. McKee.

Q. Another name I've come across is Rocky Moore. Do you know who Mr. Moore is?

A. He was the senior warden at that facility.

Q. On November of 2017?

A. Yes. You just asked me that question, and I answered it.

Q. You did. And I'm a little old, a little senile. Another name I've run across is a Richard Gunnels?

Tracy Bailey 11/6/2019

18

A.    Richard Gunnels was the senior warden at the Ferguson Unit but after November of 2017.

Q.    So he was not the warden on November 2017?

A.    No, sir.

Q.    Okay.  Thank you.  Now, you're aware at the Ferguson Unit, and I assume at other units, that the Windham School District has teachers that teach offenders?

A.    Yes, on many of the facilities.

Q.    And they had teachers there at the Ferguson Unit back in 2017, did they not?

A.    Yes, sir.

Q.    And obviously, the safety of these teachers is something that's very important to your department, is it not?

A.    Yes, sir, it is.

Q.    And you agree with me that the department is responsible for the safety of the teachers working for the Windham School District?

A.    I would agree with you that we have policies and procedures that pertain to the safety of all individuals that work on a facility and that it's all of our responsibility to watch out for one another when they're on the facility.

Q.    Well, who is then responsible for the safety

Ex. D 18

Tracy Bailey 11/6/2019

19

of teachers that teach there?

A.   Everyone on the unit is responsible for everyone's safety on a unit.  It takes everyone doing their job together.

Q.   So would the -- what employees of the department are responsible for the safety of these teachers, of your department?

A.   Everyone that works on a unit together is responsible for one another's safety.  Everyone has a job that they have to perform, and they're expected to perform that job.

Q.   All right.  Because the lawyers for the Windham School District have said that Windham has no policy-making authority regarding the safety of Windham employees.  Do you agree with that statement?

A.   I would agree -- I would say that the Texas Department of Criminal Justice and Windham School together have a responsibility for safety, because it takes everyone to do their jobs on a facility.

Q.   Let me reask my question.  The Windham's lawyers are saying that Windham has no policy-making authority regarding the safety of Windham employees.  Do you agree or disagree with that statement?

A.   I disagree with that statement.

Q.   Then am I to understand your testimony is that

Ex. D 19

20

Windham also drafts policies that are related to the safety of their teachers?

A.   I'm not familiar with Windham's policies and procedures.  Someone with Windham would need to talk about their policies and procedures.

Q.   Then let me ask you how you can testify under oath that they have policies related to teachers' safety.

MR. LINDSEY:  Objection.  Form.

A.   I didn't say they had policies.  I said it's all of our responsibilities for one another's safety.  I don't know what their policies are.

Q.   (By Mr. Grigg)  All right.  So let me ask the question again.  I'm asking about:  Does Windham have any policy-making authority regarding the safety of Windham teachers?

A.   I'm not sure what their authority is pertaining to that.

Q.   But your department does have policies that are related to the safety of Windham teachers.  Correct?

A.   We have policies related to the safety of all employees.

Q.   And does that cover teachers from the Windham School District?

A.   Our policies cover anyone who works on our

Tracy Bailey 11/6/2019

21

facilities.

Q.   All right.  And I'm going to nitpick a little with you.  Does that cover Windham School teachers?

A.   Yes, sir.

Q.   Okay.  All right.  Now, I've not had an opportunity to review these policies that were just furnished to me a minute ago, and so I'm going to have to ask some general questions about them.  Okay?

A.   Okay.

Q.   All right.  I'm looking here at the index, and I want to ask you:  Which of these policies are related to --

(Brief interruption.)

Q.   (By Mr. Grigg)  Excuse that interruption. Which of these policies that you have furnished in Exhibit 3 relate to the safety of Windham teachers?

A.   The table of -- on the table of contents, number A, the Windham security awareness course curriculum, that would pertain to Windham school employee safety.

Q.   All right.  Who -- identify for me or just explain to me since I haven't had a chance to look at it what A is?

A.   What A is is -- that is the course that all new Windham school teachers go through when they're

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. D 21

22

first -- receive employment with Windham School District prior to going to work on a facility.

Q. All right. And who drew up this course curriculum?

A. That would have been correctional training and leadership development.

Q. And that is part of the Department of Criminal Justice?

A. Yes, sir.

Q. And who's the head of that department?

A. At this given point in time, that is David Yebra because that's its own division now.

Q. What about 2017 in November?

A. At that point in time, it would have been Eric Guerrero, would have been the director over correctional leadership at that time.

Q. And again, I haven't had a chance to read this, but does this go through the department's policies that they expect teachers to follow?

A. Yes.

Q. Does it have in it policies that the department's employees are responsible for following?

A. It doesn't have specific policies. I mean, there's the personnel -- a personnel directive that it talks about. There are agency policies and procedures

Ex. D 22

23

that may be covered in here.  The policy may not be called out, but it gives the Windham school teacher a basic guideline or direction pertaining to being security aware as a new employee on a facility.

Q.  All right.  And, like, help me understand what in this correctional training is related to teachers' safety in relation to offenders.

A.  All of it in here is.  Each one of these classes is directing the teacher at how to deal with offenders daily, how to deal with their environment daily, security protocol, good practices while they're performing their job duties.

Q.  And this course, you're saying, was provided by or authored by Eric Guerrero.

A.  It would not have been authored by Eric Guerrero.  There is a curriculum department, and that curriculum department would have written this curriculum; but the curriculum would have been reviewed by someone in correctional training and leadership development.

Q.  All right.  Do any of these other policies that you furnished us in Exhibit 3 relate to the safety of Windham teachers?

A.  I mean, all of them would.  The Ferguson Unit standard operating procedure for education and vocation

24

officers for 2018 and 2019.  That is just a standard operating procedure that was developed on the unit by Warden Moore that gives the security staff and the education department more direction on what to do on a daily basis in that area.

Q.   All right.  So these policies were developed by Warden Moore?

A.   I believe 2018 was signed off on by Warden Moore, and 2019 may have been Warden Jones.

Q.   Were these policies the same as they were in 2017?

A.   I've not been able to review one from 2017, so I don't know exactly what it was in 2017.

Q.   Shocking.  All right.  Well, who would have written or complied [sic] the policies back in 2017? Would that have been Mr. Moore?

A.   That would have been the warden on the facility.

Q.   And so as far as the policies in B, they would have been developed for the Ferguson Unit by the warden, Mr. Moore?

A.   That's correct.

Q.   And would Mr. Moore be responsible for making sure these policies are carried out properly?

A.   Warden Moore and his staff on the facility,

Tracy Bailey 11/6/2019

25

the correctional staff on the facility.

Q.   And obviously, these policies are just writing on paper, and what's critical is to make sure they're enforced and carried out.  Correct?

A.   The most important thing is that they are enforced and they're implemented.

Q.   On a day-to-day basis?

A.   That's correct.

Q.   All right.  And there at the Ferguson Unit in 2017, Mr. Moore would be responsible to make sure these policies were carried out properly on a day-to-day basis?

A.   He would have the oversight of that, yes, sir.

Q.   And then under him, there were two assistant wardens?

A.   That's correct.

Q.   And they, too, would be responsible to make sure that the rules, regulations, and policies were properly carried out by the staff?

A.   That's correct.

Q.   And the same thing, the majors -- major correctional officers -- would be responsible to make sure policies were properly carried out?

A.   All staff on a facility have the responsibility to enforce and follow policies.

26

Q.   Now, what about C, post order education and vocation officer?

A.   Those are the post orders for the correctional officers that are assigned to the education and vocation department.

Q.   And again, of course, I haven't had a chance to read this.  Tell me a little bit about what those are.

A.   It's just a very general outline of the responsibilities of those officers that are working in that area on a daily basis.

Q.   And what area are we talking about?  I mean, I'm interested obviously in officers that are working with Windham teachers.  And this says something about education, vocation, so --

A.   And those are the officers that are working with Windham teachers in the education department and in the vocation department.

Q.   All right.  Are these -- who comes up with the policies?  Who writes the policies in -- for C?

A.   Those policies are written in the -- by the plans and operations department within the correctional institution division.  Then from there, they are reviewed by wardens on facilities, by regional directors throughout the agency, the deputy directors, as well as

Ex. D 26

Tracy Bailey 11/6/2019

27

the correctional institution division director.  And then they are updated either as policies change or at least yearly.

Q.   All right.  You say the plans and operations. Who was the individual, then, that wrote or had to oversee the writing of these policies?

A.   At this given point in time, the supervisor of that area would have been Michelle Lewis.

Q.   And she was the supervisor of?

A.   Of the plans and operations department.

Q.   All right.  And then help me again on -- she wrote the policies.  Who had to sign off on them?

A.   The final signature on a post order would have been the correctional institution division director, Lorie Davis.

Q.   And is Ms. Davis your boss?

A.   Yes, sir.

Q.   And was she in this position to have to sign off on this back in 2017?

A.   She would have been in her position in 2017.

Q.   Okay.  And again, I haven't read it, so help me understand a little bit generally what topic C, or post order education vocation officer.  What, generally, does the policies under part C do?

A.   Those post orders give general guidelines for

Ex. D 27

Tracy Bailey 11/6/2019

28

the correctional officer that is working the education department or the vocation department.  They're daily guidelines of what they should do while they're at work.  It's just very general about the responsibilities in those areas.  That can have to do with security practices.  That can have to do with keys, chemicals, tools, search procedures, offender movement, just basic guidelines.

Q.   All right.  And today when I'm asking you, unless I specify otherwise, I'm talking about teachers in the education system.  Okay?

A.   Okay.

Q.   All right.  And if you need to clarify that as we're going along or something, please do so.

A.   Yes, sir.

Q.   All right.  These general guidelines, they go to all units, or is this just Ferguson?

A.   They go to all facilities.

Q.   All right.  And then you said they're general. Who interprets or decides how they're specifically going to be applied at each unit?

A.   Each unit warden will determine how it's going to specifically be applied on that facility.

Q.   Got it.  Now, help me with C.  What does the -- are these policies for your employees of the

Tracy Bailey 11/6/2019

29

department, or are they for the teachers that are working for Windham?

A.   These are for the correctional officers that are assigned to the education and vocation departments on each facility.

Q.   All right.  So tell me generally what their job is.  For example, do they actually teach classes?

A.   Those officers do not teach classes.  Windham School teaches the classes.

Q.   All right.  Then tell me generally what these officers do.

A.   The officers would be responsible for the movement of the offenders, rostering them into the education department, out of the education department, the oversight of making sure that the keys, chemicals, and tools are in compliance with agency policies and procedures, ensuring count is being conducted in that area of the facility, that -- just the overall security of that department.

Q.   All right.  Now, I want -- because you're talking about chemicals and all, I assume those are items used in vocational training?

A.   They can be, yes.

Q.   All right.  Who decides how many guards -- and I'm talking about the general day-to-day operation --

Tracy Bailey 11/6/2019

30

how many guards are going to be assigned to an educational unit and what procedures they're going to follow on a day-to-day basis?  Who decides those rules?

A.    Well, every facility has a unit staffing plan. And in that staffing plan, it says how many correctional officers are assigned to a specific area at specific times of the day.  And those staffing plans have been in existence for many, many years.  And they are reviewed annually.

Q.    All right.  And who's responsible for reviewing those plans?

A.    The warden on a facility as well as the regional director, with the warden at security operations, with many other individuals, yearly, sit down at a table and they go down through the staffing plan and through the rosters and they look at statistical data pertaining to a facility:  mission changes on a facility, custody of offenders on a facility, many different things.  And then it's determined if there's any changes that need to be made.

Q.    Tell me about the statistical data that's reviewed.

A.    Statistical data could be disciplinary history on a facility, safe prison statistics on a facility, and then any other thing that the warden deems that they

Ex. D 30

31

feel like is necessary to be looked at.

Q.   Does it also contain data on individual offenders?

A.   No, sir.

Q.   So generally, it's just the disciplinary history for, in this case, the Ferguson Unit?

A.   Yes, sir.

Q.   Would it have data concerning assaults on officers by offenders?

A.   That can be looked at at times.

Q.   What about data for assault on teachers?

A.   Not specifically teachers.

Q.   How would one find out if there was a problem or the number of assaults by offenders on teachers? Does that data exist somewhere?

A.   I've not seen data specifically on assaults for teachers.

Q.   What kind of assault data would this information have, then?

A.   Just overall number of assaults on a facility.

Q.   All right.  Would that be -- is it divided up, say, where you could determine offender on offender?

A.   Yes, sir.

Q.   Is it divided up where you could tell offender on an employee of the department?

Ex. D 31

32

A.   Offender on staff, yes, sir.

Q.   But you don't know if it has any data on offender on teachers?

A.   The only data would be offender on staff or offender on offender, not a specific position.

Q.   Would the offender on staff -- would the staff include Windham teachers?

A.   Yes, sir.

Q.   And do you know anything generally about the statistics of assaults on the Ferguson Unit?

A.   No, sir.

Q.   All right.  What is D, security review checklist?

A.   That is just, every year on the Ferguson Unit a security review is conducted by an individual that's not assigned to the Ferguson Unit.  And that was just the checklist that I felt like could be -- include the education department.  It's office security and programmatic department checklist.

Q.   And you said it could include education?

A.   Yes.

Q.   Does it?

A.   Yes, it does.

Q.   And what would this tell me, when I have an opportunity to read it, about education?

Tracy Bailey 11/6/2019

33

A.   This is just looking at what the individual that is looking at that would be doing the security review on that facility, the security practices that they would be looking at.

Q.   And who would be doing that review at the Ferguson Unit?

A.   It would be a warden that is not assigned to the Ferguson Unit.

Q.   All right.  Do you know who did that review back in 2017?

A.   No, sir, I don't.

Q.   What would this -- if someone is looking for policies that help protect Windham teachers, what would be in D that would be relevant?

A.   It just shows that what the agency -- some of the things the agency would be looking at when conducting a security review on the compliance of security practices on a facility.

Q.   All right.  But my specific question is:  What in the security review checklist, would be relevant to the safety, the protection, the security of Windham teachers?

A.   When you're looking at -- when you're conducting a security review, it is covering the safety of all employees, which would include your Windham

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. D 33

Tracy Bailey 11/6/2019

34

staff, to ensure that policies and procedures are being enforced; they're in practice.

Q. And does it specifically in there divide out Windham teachers?

A. No, sir.

Q. So it includes everyone, I guess, basically working at the Ferguson Unit?

A. That's correct.

Q. Now, the last one is E, disciplinary charges, Code 20.

A. I just reviewed the Code 20 charge for sexual misconduct to make sure that I did remember exactly what the charge said.

Q. All right. Does this specific disciplinary charge as Code 20, does that relate to offender assaults on staff, teachers?

A. Not the Code 20. The Code 20 is sexual misconduct by an offender in public or offender on offender.

Q. All right. Is there anything under E, disciplinary charges, that concerns or is related to discipline of offender assaults on staff or people working at the prison?

A. Not in this book, not in this book, not under the Code 20. That would be a different charge.

Ex. D 34

35

Q.   All right.  What charge relates to offender assaults on people working at the prison?

A.   There is a code for that.  That's a Level 1. I can't tell you the exact code number.  I didn't bring that with me today.

Q.   And you did review the topics we wanted to discuss, did you not?

A.   I did.

Q.   And one of them is about policies related to teacher safety.  Correct?

A.   That's correct.

Q.   And you did not bring us the code that would discuss offender assaults on teachers?

A.   I did not bring that today.

Q.   But there is one?

A.   There is for -- not just for teachers, but there is a code for assault on a staff member.

Q.   And that code would cover assaults on teachers?

A.   That's correct.

Q.   How does the department keep up with assault on staff?

A.   Well, anytime an offender is written a disciplinary case, that is entered into our computer system.  And so we have the ability to query

Ex. D 35

36

disciplinary cases to determine if the charges were for an offender or for a staff member -- if the assault was against an offender or a staff member.

Q.   All right.  Where are these records kept?

A.   They're in the computer system.  Executive services has oversight of that.

Q.   And so that's who you would go to to find those records?

A.   Yes, sir.

Q.   And who's in charge of these records at executive services?

A.   There is a new supervisor that's over that area.  Last name is Brock.  I would --

Q.   Spell that.

A.   B-R-O-C-K.

Q.   Okay.  So he would be the one to go to to get these records?

A.   That's correct.

Q.   All right.  Now, help me understand these records.  You say they're offender -- is assault the right word or offender conduct on staff or -- help me.

A.   It would be dependent on exactly what information you are wanting.

Q.   All right.  Could you find, in searching this database, offenders' assault on department staff?

Ex. D 36

37

A.   Yes.

Q.   Could you search and find offenders' assaults on Windham teachers?

A.   You would have to talk to Mr. Brock about exactly how -- how and what you could get out of that information.

Q.   And what about offender -- and I guess I'm using the word assault.  What about assault of a sexual nature?  Could you specifically look up assaults of a sexual nature?

A.   On staff?

Q.   Yeah.

A.   You would need to talk to Mr. Brock about exactly how you would gather all that information and what could get out of there.

Q.   Obviously, offender assaults on other offenders, on staff, of a sexual nature are of great concern to your department?

A.   Yes, sir.

Q.   And I believe they even have what's called a prison rape elimination act or ombudsmen that look into those areas?

A.   Yes, sir.

Q.   All right.  And what kind of policies do you have -- the department have -- that are related to

Tracy Bailey 11/6/2019

38

sexual assaults or sexual harassment on teachers by offenders?

A.   Sexual harassment by an offender to a staff member would be reported through the offender disciplinary process.  The offender's behavior would be reported that way.

Q.   All right.  And would that be kept in these records at the executive service by Mr. Brock?

A.   Yes, sir.

Q.   All right.  Now, this is a little bit different question.  Does the department have policies that are related to offender sexual harassment of staff, including teachers?

A.   Do they have policies?

Q.   Uh-huh.

A.   The policy would be the disciplinary policy because those incidents are dealt with through the offender disciplinary process.

Q.   And this disciplinary policy would cover any kind of assault on teachers?

A.   Any kind of assault on staff.

Q.   Would that include teachers?

A.   Yes, sir.

Q.   Would it include -- this disciplinary policy include discipline for assaults or harassment of

39

teachers of a sexual nature?

A.   Yes.

Q.   And what is this policy?  I mean, you haven't provided it here today.  What is this policy?

A.   We have a disciplinary policy and procedures manual, and it covers all charges that an offender can be charged with for behavior that could be inappropriate.  And that's many different types of behavior.

Q.   All right.  And did you bring that manual with you today?

A.   I did not.

Q.   Did you bring anything with you today that would relate to the disciplinary procedures of an offender related to any kind of sexual harassment or assault on staff members?

A.   No, I did not.

Q.   Is there a specific policy that sets that out?

A.   The policy is there's a disciplinary -- offender disciplinary procedures manual.

Q.   Got it.  And does this manual have a section on assaults or harassment of a sexual nature?

A.   It has -- there are charges that offenders can receive for assault of a staff in there.

Q.   All right.  Is there anything in there

40

specific -- I know you can have a physical assault.  But also is there anything in this manual for assaults or harassment of a sexual nature?

A.    I would have to go in and review those charges specifically to narrow that down.

Q.    Okay.  Because obviously you certainly don't want assaults of a sexual nature happening to anyone on your staff?

A.    No, sir.

Q.    And that certainly includes any kind of assault of a sexual nature on any Windham teachers.

A.    That's correct.

Q.    You also don't want any kind of sexual harassment by offenders on staff?

A.    No, sir.

Q.    And certainly you don't want any kind of sexual harassment of Windham teachers by offenders, do you not?

A.    That's correct.

Q.    And --

A.    Can we take a break?

Q.    We sure can.

            (Short recess.)

Q.    (By Mr. Grigg)  I think we were talking about discipline.  And I want to get a feel for what kind of

Ex. D 40

41

discipline the department uses against offenders, but I want to sort of limit it to things that could happen in the classroom and with education, not offender on offender, and that kind of thing.

And let me just start out:  In this case I've seen references to writing a case.  What does that mean?

A.   When an offender engages in some behavior that is against policies and procedures, we have that disciplinary manual.  And there are all different cases that an offender can be written up for.  There is a disciplinary report that is generated by the individual staff member that witnessed that behavior.

Q.   All right.  So is writing a case -- and I'm just sort of lost on what that means.  Does that just refer to some form that's filled out, in this case by a teacher, about something that happened in the classroom?

A.   There is a form that is filled out.

Q.   Is that filled out -- and here's what I'm driving at:  Can a teacher ask a student to be removed?

A.   Yes, sir.

Q.   All right.  And when a teacher asks a student to be removed, she writes a case?  Or is that a different term?

A.   They can write a case, or they may just ask

Tracy Bailey 11/6/2019

42

for the teacher [sic] to be removed and for someone to talk to the offender, and then the offender can go back to the class.  But they can also ask for the offender to be removed, and then the teacher can write the offender the appropriate disciplinary charge.

Q.   Can a teacher just write a case and not have the offender removed from the class?

A.   Yes, sir.

Q.   And help me understand the severity of discipline, because I'm a little lost on what writing a case means.  If a teacher just writes a case and doesn't have the student removed, is that just something that goes in the student's file?

A.   No.  Once an offender receives a disciplinary case, the disciplinary case -- let's talk just in the education department.

Q.   Yes.

A.   Okay?  Then the teacher writes the offender a disciplinary case.  The disciplinary case then will be given to the security officer that's working in that area.  Okay?  The education/vocation officer.  Then a supervisor is going to investigate that disciplinary case, meaning they're going to talk to the teacher that's the charging officer or charging staff member, and they're going to talk to the offender.  And they're

43

going to write their statements on the back of that form.  Then that disciplinary is going to be given to the shift supervisor to sign off on.  Then once the supervisor signs off on it, then it's going to be forwarded to the disciplinary office.

Once it's forwarded to the disciplinary office, a counsel sub is going to enter that into the computer, going to print it out.  And at that point in time, then a major or above is going to grade that disciplinary case, meaning either major or minor.  And then at that point in time, then the counsel sub will set that offender up either for a major hearing or for a minor hearing.  And then there's a process after that too.

Q.   All right.  The -- when a teacher just writes a case, that does not mean they necessarily have the student removed from class?

A.   That is correct.

Q.   And I'm assuming -- correct me if I'm wrong -- simply writing a case, and then a step up would be having the student removed from class?

A.   That's correct.

Q.   And I guess the removal from class is when the teacher -- in the teacher's opinion, the offender's problem is more severe than just writing him up and

44

turning him in?

A. I mean, that would be up to the teacher if they felt like they could just write the disciplinary case and turn it in. But -- so if they feel like it's more severe, that the offender's behavior is meaning where he needs to be removed from the class immediately, then the teacher would then inform someone to come do that.

Q. All right. But that is an option a teacher has if a teacher feels threatened; they can have the student removed?

A. That is correct.

Q. And what do they do? Go to a guard?

A. They just get with the correctional officer that's working in that area or they can get with a principal and have the offender removed. If an offender is removed from class, then a security supervisor on the facility is going to be notified.

Q. I noticed in your lawyer's response to these topics that you're not familiar with how the Windham School District is funded?

A. That's correct.

Q. And you don't have -- or your department doesn't have and you don't have anything to do with that, do you?

Ex. D 44

45

A.   I do not.

Q.   And are you aware that the funding that Windham receives is based on hours as an offender is in class?

A.   I do understand that.

Q.   All right.  And so if an offender is removed from class, that can have a financial effect on Windham?

A.   Exactly how all that works I wouldn't be able to speak on.

Q.   But in representing the department, you certainly wouldn't want, for the safety of teachers, Windham making decisions based on, well, if you remove them from class that could cost us money.  You would not want them doing that, would you, ma'am?

A.   No.  And on a unit they're not -- security staff on a unit aren't -- they don't even know how the funding works.

Q.   Right.  And so that -- if a student is removed from class, that may affect Windham but it doesn't affect your department?

A.   I have no idea how any of that works.

Q.   All right.  Now, as you're -- are you aware that this case involves an offender masturbating in a class?

A.   Yes, that is my understanding.

46

Q.   And you would agree with me, would you not, that it would be offensive to a woman teacher?

A.   I would agree that that's offensive, period.

Q.   And especially, I guess, to a woman?

A.   It would be offensive to me.

Q.   And that could be considered some kind of -- could be considered sexual harassment of a teacher, to have an offender masturbating in her class?

MR. LINDSEY:  Objection.  Form.

Q.   (By Mr. Grigg)  You can answer.

A.   I would say that that's an inappropriate, offensive behavior.

Q.   Of a sexual nature?

A.   Yes, sir.

Q.   What is the policy of the department on offenders masturbating?

A.   We have no tolerance of that.  When an offender is caught masturbating, there is a disciplinary case for that.  And our staff are instructed, as well as Windham school teachers, how to go about filing an offender disciplinary report on an offender for that behavior.

Q.   And what is the discipline that's used for an offender that masturbates?

A.   That would be a Code 20.

47

Q.   And that's the one you furnished?

A.   Yes, sir.

Q.   And so I guess that doesn't specifically say in front of a staff or in front of a teacher or anything?

A.   No, sir.  That's in public, masturbation in public.

Q.   Let me just ask you since we're sort of talking about discipline.  A term I've run across is a PHD.  What is a PHD?

A.   That's prehearing detention.

Q.   It's not a doctorate degree?

A.   No, sir.

Q.   And then what about X block?

A.   X block would be a housing area at the Ferguson Unit.

Q.   And what does that have to do with discipline?

A.   I can't tell you exactly what is housed on X block.  There is -- that's a housing area at the Ferguson Unit.

Q.   Since that's listed some -- I've run it across it in discipline, is that maybe more restrictive or something than others, or do you know?

A.   I wouldn't be able to answer you what exactly X block is at Ferguson.

Tracy Bailey 11/6/2019

48

Q.   Another term I've run across in this case talking about masturbation is a no-skin policy.  Do you -- can you tell me what that is?

A.   I've never heard of that until I believe I read it in here.  Yes, that was the first time I've ever seen that.

Q.   So you wouldn't know what that referred to one way or the other?

A.   No, sir.  That's not terminology that we use.

Q.   And is there any different policies that the department has related to masturbation showing skin, not showing skin, in clothes, out of clothes?  Is there any distinction the department makes?

A.   No, sir.  I've never seen that terminology.

Q.   All right.  I want to ask you a few questions. We've discussed about guards, but I read off and on in doing some research on the internet about problems with a shortage of guards or correctional officers.  And I want to ask:  Back in 2017, was that an issue with having problems hiring and keeping guards?

A.   We have that problem currently and did have that problem in 2017.

Q.   Do you know what the status was of guards at the Ferguson Unit back in November of 2017?

A.   I do not know what their staffing level was at

Ex. D 48

Tracy Bailey 11/6/2019

49

that time.

Q.   Who makes the decisions, if there is a shortage, on where guards are to be assigned?

A.   That is a combination of the wardens working with the regional directors to determine what positions need to be filled during that time period.

Q.   And help me with the regional director.  Is that a step up from wardens?

A.   Yes, sir.

Q.   And who would be the regional director in 2017 that would have responsibility for Ferguson Unit?

A.   Tony O'Hare would have been our regional director in Region 1 at that time.

Q.   And Ferguson is in Region 1?

A.   Yes, sir.

Q.   Do you actually work in Huntsville or Austin or where?

A.   I work in Huntsville.

Q.   All right.  Do you know who would be -- have the responsibility or make the determination on how many guards would be assigned to the education unit at Ferguson?

A.   I believe we talked about this earlier.  That is determined off of the staffing plan for the Ferguson Unit.

Tracy Bailey 11/6/2019

50

Q.   For the staffing plans that we discussed, does that take into account if there's a shortage?

A.   No, sir.

Q.   If there is a shortage, then it's determined how to allocate guards, I guess, by the warden and the regional director or --

A.   Yes, sir.

Q.   We can agree, I guess, that it's important for the safety of teachers to have guards assigned to the educational unit?

A.   Yes, sir.

Q.   And if there are no guards on an educational unit on a particular day, would -- we can agree that that could increase the risk for teachers, couldn't it?

A.   If there were no guards assigned to that area, that's correct.  But we wouldn't turn education out with no guards in the education department.

Q.   Because just as you said, if there were no guards, that would certainly increase the risk and be a danger to the safety of teachers?

A.   It could.

Q.   And could the same be true if there's not an adequate number of guards on the unit?

A.   It could.

Q.   Let me ask you -- and I don't know if you know

Ex. D 50

51

or not -- do you know what guards were assigned to the education unit, if any, on the day Ms. Truelove was raped?

A. I do not.

Q. All right. I want to try to understand a little bit about chain of command and policy. And from what I've read, the Texas Department of Corrections -- the division is governed by a board appointed by the governor?

A. That's correct.

Q. And they, I guess, are -- as I understand it, are responsible for ultimately making policy?

A. The board?

Q. Uh-huh.

A. I don't know if the board make -- I mean, they don't make the policies. The agency makes the policies, and then they -- some policies go to them for review.

Q. Do you know what policies, if any, go to them for review on safety that would affect teachers?

A. No, I do not.

Q. All right. And of course, they can delegate responsibility on down, and I guess under them is the executive director?

A. Yes, sir.

Q. And who was that in 2017?

Tracy Bailey 11/6/2019

52

A.    That would have been Bryan Collier.

Q.    And what are his responsibilities in determining policies concerning safety?

A.    Well, Mr. Collier has oversight of the whole, entire agency; but he has many division directors that oversee the different areas.  And so there are some policies and procedures that may go to him for review.

Q.    All right.  Who, then, is responsible for the original writing or composing of policies regarding safety?

A.    Within the correctional institution division, the plans and operations department is the one that writes the policies and procedures that then are sent out to review and comments from many different areas in our agency.

Q.    All right.  And I may be mixed up.  Who's the head of the plans and operations?  Is that in your division?

A.    Yes, it is.  And at that point in time, it was Michelle Lewis.

Q.    All right.  Now, who is Lorie Davis?

A.    Lorie Davis is the corrections institution division director.

Q.    Your boss?

A.    Yes.

Tracy Bailey 11/6/2019

53

Q.   And Michelle Lewis would have been working under her at the time?

A.   She would have been working under me at the time as the supervisor of the department for plans and operations.

Q.   Okay.  So your department back then, it would be Lorie Davis, then you, then Michelle Lewis?

A.   Yes.

Q.   Okay.  So -- and help me here understand.  All right.  So policies concerning safety would be written by Michelle and people working for her, or by who?

A.   The ones that are policies and procedures that are underneath the correctional institution division would be, either yearly, every two years, or when needs to be updated, reviewed by plans and operations.  Suggested changes would be made to those policies and procedures.  Those policies and procedures then would be staffed out to individuals within the correctional institution division, and sometimes outside of the correctional institutional division if it has anything to do with other departments or other divisions.

Those comments then would come back in to plans and operations.  And then plans and operations would then add anything that another division, department, or someone underneath correctional

Ex. D 53

Tracy Bailey 11/6/2019

54

institutions recommended. And then at that point in time, after that -- after that is done, then myself, as the deputy director that's over plans and operations, then the other two deputy directors within the correctional institution division, would review, as well as Ms. Davis, to make a final determination about what would be implemented into those policies and what would not be implemented in, if there were any comments.

And then from there the final draft would be done. Ms. Davis, depending on what policy it is, then would review it with Mr. Collier. And then the implementation would be done, the update of it would be done.

Q. All right. This process you described, would that cover safety policies that would be related to Windham teachers?

A. It would be safety policies or security procedures pertaining to any staff member or offender within the agency.

Q. Let me --

A. Not just Windham.

Q. Let me reask my question: Would this procedure you've discussed apply to safety regulations related to Windham teachers?

A. Yes.

Q.   All right.  Now, so did I understand, you get input from various parts of the department and divisions.  And then I'm not clear on who finally makes the decision on we're going to include this suggestion but not this suggestion and comes up with the final policy.

A.   The three deputy directors within correctional institution division, myself -- at that point in time would have been Leonard Echessa and then Billy Hirsch -- the three deputies would review with Ms. Davis, the correctional institution division director.  And then from there, it would be dependent on the policy.

Q.   Safety that would relate to teachers?

A.   Yes.  Some policies would be taken and Ms. Davis would review with Mr. Collier.  Some Ms. Davis would have the final implementation of them.

Q.   What about safety related to Windham teachers?

A.   It's the same.

Q.   Some would be just Ms. Davis and others Mr. Collier?

A.   Yes.

Q.   So you didn't have the authority to make the final decision.  You had to send it up?

A.   Yes.

Q.   Now, once these policies are determined, does

Tracy Bailey 11/6/2019

56

anyone, such as the board or anyone above Mr. Collier, review them?  Or does Mr. Collier and Ms. Davis have the final say?

A.   I'm not exactly sure which ones go -- which ones they review in front of the board and which ones they don't.  I couldn't answer that.

Q.   Now, I sent -- or let me ask:  Does Ms. Davis work here in Huntsville?

A.   Yes, sir.

Q.   And so does Mr. Collier?

A.   Yes, sir.

Q.   All right.  So who, then, is responsible for the implementation of these policies at Ferguson?

A.   The warden would be.

Q.   All right.  So the warden is the one that's responsible at Ferguson to make sure that the daily operations observe and follow these procedures?

A.   The warden would be.  And the different departmental heads, supervisors throughout the facility, no matter what division they work for, would be responsible.

Q.   Okay.  I want to just make sure.  I think I may have asked this, but the disciplinary procedures that we've talked about, writing a case, whatever, are covered by which policy?

57

A.    There is a -- an offender disciplinary procedures manual.  That's probably -- let me see.  Yes.

Q.    All right.  And that is dated 2015.  Would that be the one that applies in 2017?

A.    Yes, it would.

Q.    Okay.  I'm going to look through it.  All right.  I want to ask you:  Does the department have any written policies on security cameras?

A.    Can you clarify a little bit more?

MR. GRIGG:  Let's go off the record.

(Discussion off the record.)

Q.    (By Mr. Grigg)  Does the department have any policies concerning security cameras?

A.    We have some policies concerning security cameras.  I guess you're going to have to clarify a little bit more.

Q.    Well, where would -- let's just sort of start generally maybe and work down.  Where would one find these policies?  Are they written?

A.    Yes.  In the past, video surveillance cameras fell underneath the security operations department, which is in the correctional institution division.  However, recently that has moved from security operations and it's currently underneath our ITD department.

Tracy Bailey 11/6/2019

58

Q.    Your what?

A.    ITD.  I'm trying to think.  It's under our communications, that department.

Q.    All right.  But it was under your department back in 2017?

A.    It would have been underneath the correctional institution division in 2017.

Q.    Here's what I'm asking:  Are there written policies like some of these you furnished in Exhibit 3 concerning security cameras?

A.    Yes.  There was in 2017.

Q.    And where would one find that?

A.    Those policies would have been underneath the security operations department.  There is -- they have an operating manual, and there are policies concerning that there.

Q.    And what would the name of this policy be?  What would you ask for if I wanted to see this policy?

A.    You would ask for the policies and procedures relating to comprehensive video surveillance systems.

Q.    Video surveillance systems?

A.    Yes, sir.

Q.    And this policy, I assume, was formed by the same procedure you discussed a while ago with -- ultimately decided back in 2017 by Ms. Davis and

Tracy Bailey 11/6/2019

59

Mr. Collier?

A.   No, that's not how that started.

Q.   Okay.  Help me understand who promulgated this written policy.

A.   Okay.  That policy would have been written by staff members that worked in security operations about the procedures on how to handle video surveillance equipment.

Q.   Well, who signed off -- who approved that policy?

A.   Those procedures would have been approved by the warden that was over security operations at that time and then the deputy director who oversees security operations at that time.

Q.   All right.  Now, I need some help here.  The warden at each unit?

A.   No.  The warden that's over security operations.

Q.   And so that's somebody that's not at a unit but, what, here in Huntsville or something?

A.   That's correct.

Q.   And who would that have been back in 2017?

A.   That would have been Daniel Dickerson.

Q.   And what would Mr. Dickerson's title be?

A.   Warden.

60

Q.   But not like warden over security or -- just warden?

A.   Warden of security operations.

Q.   Okay.  So he would have approved the policies related to cameras or video surveillance?

A.   Yes.

Q.   And I'm sorry.  I'm a little dense, but let me ask you:  Was he in your unit at that time, or in another unit?

A.   What do you mean another unit?

Q.   Who did -- was he in your department or your unit?

A.   His -- the deputy director that would have supervised him at that time would have been Billy Hirsch.

Q.   And your -- can we call it unit or division or what do you call it?

A.   In my division.

Q.   In your division.  And so it would have been Mr. Dickerson, and he would have reported to Mr. Hirsch. Did Mr. Hirsch report to you or Ms. Davis?

A.   Ms. Davis.

Q.   All right.  So Mr. Dickerson, is he still with the department or...

A.   Yes, he is.

Ex. D 60

Tracy Bailey 11/6/2019

61

Q.   Just a different position?

A.   Yes, sir.

Q.   All right.  So he would have been the one in charge of coming up with policies related to video surveillance?

A.   Yes.  But -- yes, sir.

Q.   Yes but?

A.   Well, I mean, you're asking very vague about video surveillance, but yes.

Q.   Yeah.  All right.  And I haven't seen the policy yet, so I'm a little vague.  But all right.  For example, who determines, under that policy or any policy, where video surveillance cameras are located?

A.   That could be -- that could happen numerous ways.

Q.   All right.  And let's say in the Ferguson Unit in 2017, who would make those determinations?

A.   For the Ferguson Unit in 2017, if the warden would have felt like they needed a video surveillance camera in an area, they would submit a request to their regional director and then their regional director then would review that.  That request would be sent in to that warden of security operations, Daniel Dickerson.  And from there, then they would have a discussion with Mr. Hirsch.

THE LEGAL CONNECTION, INC.
WWW.TLC-TEXAS.COM

Ex. D 61

62

Q.   All right.  Let me make sure I understand this.  All right.  If the warden, Mr. Moore, wanted security cameras in classrooms where the Windham teachers were teaching, okay, he would make a request to the regional director.  The regional director then would get with Mr. Dixon [sic] --

A.   Dickerson.

Q.   Dickerson.  I'm sorry.  -- and decide whether or not that request is to be granted?

A.   No.  Then Mr. Dickerson would get with Mr. Hirsch, Billy Hirsch, the deputy director.  And then at that point in time, either Mr. Hirsch would have the authority to do that or he would get with Ms. Davis or they would have to determine funding with Mr. McGinney (phonetic) if it was felt like it was needed.

Q.   Okay.  And obviously having video surveillance is a safety factor?

A.   It is an additional security tool.

Q.   So it's an additional security tool that can increase safety?

A.   Yes, sir, it could.

Q.   And do you know, do they have security cameras in -- anywhere in the department in classrooms?

A.   I do not believe that we have any in classrooms.

Tracy Bailey 11/6/2019

63

Q.   Do you know if security cameras had been requested for classrooms and that request been denied? Do you know that?

A.   I wouldn't be able to answer that.

Q.   But to your knowledge, there are none in classrooms?

A.   Not in classrooms.

Q.   Do you know if any have ever been requested in classrooms?

A.   I do not know that.

Q.   Do you know -- the offender in this case is a man named Xavier Johnson.  And are you familiar with him or any problems that he may have had while an inmate?

A.   No, sir.

Q.   Have you looked to try to determine if you could find any data about any problems that the department may have had with him while he was an inmate?

A.   No, sir.

Q.   Let me ask you about another area.  What about -- who determines, you know, the design of the classroom, what safety features are going to be in a classroom, that kind of thing?

A.   That can be determined by numerous individuals, from the teacher to the principal to the warden, as far as the furniture design of a facility,

Ex. D 63

64

inside the classroom.

Q.   What about safety features like glass doors or making the classroom more transparent to the correctional officers walking by, those kind of things? Who makes those safety determinations?

A.   Anyone on a facility can request those type of items to be looked at or reviewed.  And then the warden on a facility would have a say-so on any structural changes, as well as there's a procedure through maintenance for any type of structural changes.

Q.   And I guess, is that a written procedure that shows the chain that a request goes through?

A.   I don't know if there's a written procedure on that.

Q.   Now, are you aware of any investigation that was done on Ms. Truelove's rape?

A.   I know that there was an investigation done.

Q.   Have you reviewed that?

A.   I have not.

Q.   Are you aware generally of the frequency of sexual assaults on staff, including teachers?

A.   Can you clarify?

Q.   Yeah.  Can you -- all right.  Give me, oh, a rough number of how many, if you know, through your research have found how many, say, assaults that they

65

have on staff every year in the department.

A.   Total number of assaults on staff in the department?

Q.   A ballpark, yeah.

A.   I don't know that.

Q.   What about at the Ferguson Unit?

A.   Total number of assaults?  No, sir, on the Ferguson Unit.

Q.   Do you have any feel for how many a year?

A.   No, sir.

Q.   And the same would be true about Windham teachers?

A.   That's correct.

Q.   Now, we've talked all morning about various policies that the department has concerning security and safety.  Whatever those policies were, they weren't good enough to prevent this rape, were they?

MR. LINDSEY:  Objection to form.

A.   I mean, I don't know the whole circumstances of the situation -- of the incident.

Q.   (By Mr. Grigg)  But whatever policies, whatever procedures you had in place, you'll agree with me, didn't prevent this rape?

MR. LINDSEY:  Objection.  Speculation.

A.   The agency had some policies and procedures in

66

place. And all individuals, including Windham school teachers and staff, have a responsibility to follow any procedures that we have in place also.

Q. Do you believe -- or what are you saying? Are you saying that Ms. Truelove did something wrong?

A. No, sir. I don't know the incident. I don't know the situation.

Q. All right. Were any policies or procedures reviewed after Ms. Truelove was raped?

A. There have been some policies and procedures reviewed and changed after that, but I don't know if it was specifically because of the incident at Ferguson.

Q. Describe for me these changes that occurred after the rape.

A. I know from the review of this Exhibit No. 3 with the post orders that there was a post order for the correctional officer in the education and vocation area that was dated January 15th, 2017. And I know that it was updated February 15th, 2018. But I do not know if it was a result of that incident.

Q. All right. I'm totally lost on what you just said.

A. Okay.

Q. Help me understand. And is that in this book?

A. It is.

Tracy Bailey 11/6/2019

67

Q.   All right.  What are we -- explain to me in simple terms what we're talking about.

A.   Okay.  The post order in Exhibit 3, number C, there was a post order for that correctional officer in place on the date of the incident.  And that post order was updated February the 15th, 2018, after the incident.  But I do not know if it was updated as a result of the incident.

Q.   Right.  All right.  I appreciate that.  Tell me what the post order was.  Help me understand what the post order was before and then what it was after.

A.   There was just a few little small things -- not small things but a few little things from my review.  One pertained to offenders working in the education department not being allowed to help in the movement of offenders from class to class and giving instructions for offenders to move.  And then there was an additional add-on about security staff members checking classrooms to ensure all offenders had exited the classrooms.

Q.   All right.  Were these changes made -- whether they're related or not -- I understand your position there -- but were these changes made after Ms. Truelove was raped?

A.   They were made February the 15th, 2018, but I do not know what the reasoning was.

68

Q.   I understand that.  All right.  But they changed the policies that were in effect -- these post order changes were made -- changed the policy that was in effect on the day Ms. Truelove was raped?

A.   The changes weren't made that day.  They were made February 15th, 2018.

Q.   I understand that.  But these changes made -- I'm putting this very poorly.  Okay.  I understand what you're saying.  These changes were made.  And so as of February of 2018, the procedures were different than they were on the day she was raped?

A.   That's correct.

Q.   Okay.  And do you know, based on anything you reviewed, how many guards were present on the day she was raped?

A.   I do not know that.

Q.   And I believe you told me you haven't reviewed the investigation?

A.   No, sir.

Q.   But is that standard department policy when an incident such as this happens, that there's an investigation that's conducted by the department?

A.   Yes, sir.

Q.   All right.  And that's just standard procedure whenever something like this happens to anybody on the

Ex. D 68

69

staff?

A.   Anything that the agency deems as serious in nature, there is an investigation conducted.

Q.   And who is responsible for that investigation?

A.   That would be dependent on who was assigned, either by Ms. Davis or Mr. Collier.

Q.   And do you know who was assigned to do this investigation?

A.   No, sir, I don't.

Q.   But it would have been assigned by Ms. Davis or Mr. Collier?

A.   Or Mr. Mendoza.  Yes.

Q.   And Mr. Mendoza is Mr. Collier's assistant or what?

A.   It's his -- he's the -- he's -- yes.

Q.   Are there policies, written policies, that set out how and when these investigations are to be conducted?

A.   There was a policy at that point in time about serious incident reviews.

Q.   About serious incident what?

A.   Serious incident reviews.

Q.   And where would one find that policy?

A.   That's within our agency departmental procedures.

Ex. D 69

70

Q.    In your agency?

A.    Within the Texas Department of Criminal Justice.

Q.    What about, though, in your -- would it be in your division or somewhere else?

A.    I can't tell you if that's a policy that's under our division or if that's underneath the entire agency.

MR. GRIGG:  Okay.  I think that's all I have.  We can take a short break, and I'll read all this that you've given me.

MR. LINDSEY:  Yes, sir.  Good luck with that.

MR. GRIGG:  Let me look real quick, but I think that's it.

(Break taken.)

MR. GRIGG:  I have no more questions. Thank you, ma'am.

(Exhibit 4 marked.)

Tracy Bailey 11/6/2019

71

ERRATA PAGE

WITNESS NAME:  TRACY BAILEY        DATE:  11/06/2019

PAGE   LINE   CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

72

_____

ACKNOWLEDGMENT OF DEPONENT


    I, TRACY BAILEY, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on the attached errata page.


    _____
    TRACY BAILEY                          DATE

Ex. D 72

73

REPORTER'S CERTIFICATION
DEPOSITION OF TRACY BAILEY
TAKEN NOVEMBER 6, 2019

I, JANET G. HOFFMAN, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, TRACY BAILEY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to MR. DICKY GRIGG;

That a copy of this certificate was served on all parties and/or the witness shown herein on

_____.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

___X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for,

Tracy Bailey 11/6/2019

74

related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 27th day of November, 2019.

_____
JANET G. HOFFMAN, CSR
My notary commission expires 03-14-20

The Legal Connection, Inc.
7103 Oak Meadow, Suite A
Austin, Texas 78736
JBCC Firm No. 656
512.892.5700
512.892.5703 (fax)